UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OLYMPIC TUG & BARGE, INC., et al.,<br><br>        Plaintiffs,<br> v.<br><br>LOVEL BRIERE LLC,<br><br>        Defendant. | CASE NO. C22-1530JLR<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## I. INTRODUCTION

Before the court is the motion for a preliminary injunction filed by Plaintiffs Olympic Tug & Barge, Inc. ("Olympic") and Harley Marine Financing, LLC ("HMF") (collectively, "Plaintiffs"). (Mot. (Dkt. # 3); Reply (Dkt. # 26).) Plaintiffs ask the court to enjoin Defendant Lovel Briere LLC ("Lovel Briere") from declaring a breach of a bareboat charter agreement (the "Agreement") and seizing the barge that is the subject of that Agreement. (*See generally* Mot.; *see* Compl. (Dkt. # 1), Ex. A ("Agreement").)

Lovel Briere opposes Plaintiffs' motion. (Resp. (Dkt. # 24).) The court has considered the motion, all materials submitted in support of and in opposition to the motion, and the governing law. Being fully advised,[1] the court GRANTS Plaintiffs' motion for a preliminary injunction and ENJOINS Lovel Briere from declaring Plaintiffs in default based on their failure to pay its proposed increased monthly charter hire rate and from moving to arrest the barge that is the subject of the Agreement during the pendency of this action.

## II.   BACKGROUND

Below, the court recounts the factual and procedural background relevant to Plaintiffs' motion.

**A.   Factual Background**

Plaintiffs are subsidiaries of Centerline Logistics Corporation ("Centerline"), a marine transportation petroleum operator headquartered in Seattle, Washington. (Godden Decl. (Dkt. # 4) ¶¶ 1-3.) Centerline was previously known as Harley Marine Services, Inc. ("HMS").[2] (Id. ¶ 1; Franco Decl. (Dkt. # 25) ¶ 3.) Between 1987 and March 31, 2019, Harley Franco was the Chief Executive Officer ("CEO"), Chairman of the Board, and majority owner of HMS. (Franco Decl. ¶ 3.) Todd Prophet was Chief Financial Officer ("CFO") of HMS and Lovel Briere until his death in June 2017, when Matthew

---

[1] Plaintiffs request oral argument; Lovel Briere does not. (See Mot. at 1; Resp. at 1.) The court concludes that oral argument would not be helpful to its disposition of the motion. See Local Rules W.D. Wash. LCR 7(b)(4).

[2] Because it appears that Centerline was still known as HMS during the key events at issue in this matter, the court refers to HMS (rather than Centerline) throughout this order.

Godden replaced him as CFO of HMS.  (Franco Decl. ¶¶ 3, 11; Marino Decl. (Dkt. # 27) ¶ 2, Ex. A (email chain identifying Mr. Prophet as CFO of Lovel Briere in 2017)).)  Mr. Godden was the CFO and Chief Operating Officer of HMS between June 2017 and March 2019.  (Franco Decl. ¶¶ 3, 13, 15.)  Mr. Godden was appointed CEO of HMS upon Mr. Franco's termination as CEO in March 2019.  (*Id.* ¶ 15; Godden Decl. ¶ 1.)

HMS obtained vessels for its marine transportation services through the construction of new vessels, acquisition of existing vessels, and charter of new and existing vessels.  (Franco Decl. ¶ 5.)  After the onset of the 2008 recession, Mr. Franco "often took on the business risk" and used his personal credit, through special purpose vehicle entities ("SPVs") to "acquire existing vessels and construct new vessels that would then be chartered to HMS at favorable charter hire (rent) rates."  (*Id.*)  Mr. Franco acquired over 25 vessels that he sold or chartered to HMS on favorable terms through his SPVs.  (*Id.*)  During this time, and due to the "inherent conflict of interest in being the CEO of HMS and the manager of the SPVs," Mr. Franco recused himself from the HMS board of directors' votes to approve these charter agreements.  (*Id.* ¶ 6.)

Mr. Prophet, then HMS's CFO, represented the interests of HMS in the charter transactions.  (*Id.* ¶ 7.)  Mr. Franco's SPVs and HMS used a form bareboat charter agreement for these transactions that was drafted by HMS's attorney at Mr. Prophet's direction.  (*Id.*)  According to Mr. Franco, because the charter agreements between the SPVs and HMS were "essentially . . . related party transaction[s]," the form agreement "was very short, and did not contain many of the typical provisions for the protection of the vessel owner's interests."  (*Id.*)  Mr. Prophet set the charter hire rates used in the

ORDER - 3

bareboat charter agreements using a formula "based upon [Mr. Franco's] total investment in the acquisition of the vessel in question, including [his] financing costs, to provide a reasonable rate of return on the total investment" while still providing HMS "a beneficial charter hire rate." (*Id.* ¶ 8.)  Mr. Prophet had HMS's regular marine surveyor and a senior vice president confirm that the charter hire rates were "defensible" as reasonable rates.  (*Id.*)  Mr. Franco did not negotiate any changes in the terms of the bareboat charter agreement form or the charter hire rates "as they were then related party transactions from which [Mr. Franco] would benefit indirectly as an owner of HMS." (*Id.* ¶¶ 7-8.)

      Mr. Franco formed Lovel Briere on May 6, 2013, as an SPV with the purpose of acquiring the barge LOVEL BRIERE (the "Vessel").  (*Id.* ¶ 9.)  On May 22, 2013, Olympic executed the Agreement with Lovel Briere to charter the Vessel.  (Godden Decl. ¶ 4; Agreement.)  Mr. Franco signed the Agreement on behalf of Lovel Briere, and Mr. Prophet signed the agreement on behalf of Olympic.  (Agreement at 2.)  The Agreement provides that Lovel Briere would charter the Vessel to Olympic for a term of 87 months, for a "[m]inimum monthly payment of $75k/month." Mr. Prophet.  (Agreement at 1.)  Mr. Prophet determined the charter hire rate.  (Franco Decl. ¶ 10.)  The Agreement specifies that the lease "is a triple net lease[3] which includes bank fees and other misc[.] charges" and that the lease would "automatically renew and extend in perpetuity until and unless terminated by either party in writing." (Agreement at 1.)  It further provides that

---

[3] A triple net lease is a "lease in which the lessee pays all the expenses, including mortgage interest and amortization, leaving the lessor with an amount free of all claims." Bryan A. Garner, Black's Law Dictionary (11th ed. 2019).

ORDER - 4

the Agreement "may not be modified except through a writing signed by both parties" and "constitutes the entire agreement between the parties and replaces all prior and contemporaneous agreements, written and oral." (*Id.* § 9(f).) According to Mr. Franco, Mr. Prophet explained to him that the charter rate would be increased over time to cover Mr. Franco's financing costs and other charges so that Lovel Briere would continue to receive a reasonable rate of return on its investment in the Vessel. (Franco Decl. ¶ 10.) Mr. Franco also asserts that a "basic underlying assumption" of the charter agreement was that Mr. Franco would remain as CEO and majority owner of HMS during the term of the charter. (*Id.*) Mr. Franco did not request any increases in the charter hire rate over the term of the Agreement because, according to Mr. Franco, his "primary purpose" in chartering the Vessel was to help HMS. (*Id.*) After the parties signed the Agreement, Mr. Prophet became ill with cancer; he died in June 2017. (*Id.* ¶ 11.)

In January 2018, Mr. Godden, then chief operating officer of HMS, asked Mr. Franco to extend the term of the charter for ten years. (*Id.* ¶ 13.) According to Mr. Franco, Mr. Godden represented to him that HMS needed the amendment for the purpose of issuing bonds to refinance HMS's operations. (*Id.*) Mr. Godden, however, states that the parties agreed to the extension because the Vessel "was bid as a piece of equipment offered by [HMS] to the government in a public government vendor solicitation" and that, therefore, both parties to the Agreement understood that HMS "needed a stable, long-term contract to charter the Vessel to enable it to bid on the government's solicitation." (Godden Decl. ¶ 11.) Mr. Franco (on behalf of Lovel Briere) and Mr. Godden (on behalf of Olympic) executed the amendment to the charter on January 3,

2018.  (Agreement at 3 ("Amendment"); Godden Decl. ¶ 10.)  The Amendment extended the term of the Agreement for 120 months and did not include an increase to the $75,000 per month charter hire rate.  (Amendment.)  Mr. Franco states that he entered into the Amendment under the understanding that he would remain the CEO and majority owner of HMS for the extended term of the charter.  (Franco Decl. ¶ 13.)  Olympic assigned the Agreement and Amendment to HMF in May 2018.  (Godden Decl. ¶ 8.)  According to Mr. Godden, HMS's bid on the government contract was not successful, but HMS continued to rely on the Agreement and its Amendment to execute contracts with customers for use of the Vessel.  (*Id.* ¶ 12; *see* Franco Decl. ¶¶ 14-15 (stating that (1) the government initially awarded the contract to HMS but later awarded it to a competing company and (2) HMS successfully completed its bond issuance).)

In July 2018, the HMS board voted to terminate Mr. Franco as CEO of HMS.  (Franco Decl. ¶ 15.)  He was finally terminated as CEO in spring 2019.  (*Id.*)  Mr. Godden was then appointed CEO of HMS and given equity ownership of HMS.  (*Id.*)  Mr. Franco's termination and the charter agreements between Mr. Franco's SPVs and HMS have been the subject of substantial litigation since that date.  (*See id.* ¶ 16 (describing multiple lawsuits); *see also* Godden Decl. ¶ 20, Exs. 1 & 2 (describing and attaching documents relating to Mr. Franco's attempt to arrest a vessel chartered by HMF).)

According to Mr. Franco, Lovel Briere's financing costs for the Vessel have increased over the years, and the market rate charter for a barge the size of the Vessel is currently between $4,500 and $7,000 per day, depending on the age and condition of the

barge. (Franco Decl. ¶¶ 18-19.) On September 27, 2022, Lovel Briere's attorney wrote a letter to Mr. Godden, now CEO of Centerline, to give notice that Lovel Briere was increasing the charter hire rate of the Vessel from $75,000 per month to $150,000 per month, effective November 1, 2022. (Compl., Ex. B ("9/27/22 Letter") at 1.) Lovel Briere offered that HMF could, instead of paying the increased charter hire rate, terminate the Agreement or purchase the Vessel on an all-cash basis before November 1, 2022. (*Id.* at 2.) If HMF chose to terminate the Agreement, Lovel Briere demanded return of the Vessel on or before October 31, 2022. (*Id.*) Lovel closed by stating that it would declare a breach of the Agreement as of November 1, 2022, if HMF continued to possess the Vessel without paying the increased charter hire rate. (*Id.*) This lawsuit followed.

**B.     Procedural Background**

Plaintiffs filed their complaint in this matter on October 27, 2022. (*See generally* Compl.) They seek a declaratory judgment that the Agreement, as amended, is a valid and binding contract that remains in "full force and effect;" that the monthly charter hire rate under the Agreement is $75,000 per month, triple net; and that the term of the Agreement expires on December 31, 2027, per the terms set forth in the Amendment. (*Id.* at 6.) They ask the court to enter preliminary and permanent injunctions precluding Lovel Briere from declaring a breach of the Agreement and arresting the Vessel. (*Id.*) Plaintiffs also filed an emergency motion for a temporary restraining order and for a preliminary injunction and gave notice to counsel for Lovel Briere of their filing. (*See* Mot.; 10/28/22 Gossler Decl. (Dkt. # 9).)

On October 31, 2022, the court granted Plaintiffs' motion for a temporary restraining order; enjoined Lovel Briere from declaring a breach of the Agreement related the increase of the hire rate for the Vessel and arresting the Vessel based on any such breach; and ordered Plaintiffs to provide security of $75,000 pursuant to Federal Rule of Civil Procedure 65(c). (TRO Order (Dkt. # 10).) During a telephone conference on November 2, 2022, the parties agreed on a briefing schedule for Plaintiffs' motion for a preliminary injunction and the court ruled that the temporary restraining order would remain in effect until the court ruled on Plaintiffs' motion. (*See* 11/2/22 Min. Entry (Dkt. # 17).) Lovel Briere answered Plaintiffs' complaint and asserted a counterclaim on November 21, 2022. (Ans. (Dkt. # 23); *see also* Am. Ans. (Dkt. # 35).) Plaintiffs' motion for a preliminary injunction is now ripe for decision.

### III.   ANALYSIS

Below, the court sets forth the standard for reviewing motions for a preliminary injunction, then considers Plaintiffs' motion and the scope of their requested injunction.

**A.   Preliminary Injunction Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Id.* at 20; Fed. R. Civ. P. 65. In the Ninth Circuit, a preliminary injunction is also proper if there are "serious questions going to the merits"

and "the balance of hardships tips sharply in the plaintiff's favor . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "[O]nce the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007)).

**B.      Plaintiffs' Motion for Preliminary Injunction**

In its response to Plaintiffs' motion, Lovel Briere does not challenge whether Plaintiffs have established that they are likely to suffer irreparable harm, that the balance of equities tips in their favor, or that an injunction is in the public interest. (*See generally* Resp.) Rather, Lovel Briere disputes only whether Plaintiffs have met their burden to show that it is likely that they will succeed on the merits or that there are "serious questions going to the merits" of their claim. (*Id.*); *see All. for the Wild Rockies*, 632 F.3d at 1135. Therefore, the court addresses only the first factor of the preliminary injunction test in this order. The court begins by evaluating whether Plaintiffs have met their burden to show either a likelihood of success or serious questions going to the merits of their declaratory judgment claim, then determines whether Lovel Briere has met its burden to show that it is likely to succeed on its affirmative defenses.

1.  Plaintiffs' Contract Claim

Plaintiffs assert that the Agreement, as amended, is unambiguous and that, as a result, the charter hire rate remains fixed at $75,000 per month. (Mot. at 8-12.) Lovel Briere counters that Plaintiffs cannot show that they are likely to succeed on their claim because the Agreement either explicitly enables Lovel Briere to increase the charter hire rate or is ambiguous with respect to the charter hire rate and should be interpreted using extrinsic evidence. (Resp. at 9-11.)

Courts "interpret and resolve disputes concerning maritime contracts according to federal law." *Heko Servs., Inc. v. ChemTrack Alaska, Inc.*, 418 F. Supp. 3d 656, 660 (W.D. Wash. 2019) (first citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004); and then citing *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007)). "Maritime contracts must be construed like any other contracts: by their terms and consistent with the intent of the parties." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, --- U.S. ---, 140 S. Ct. 1081, 1087-88 (2020). "Basic principles in the common law of contracts readily apply in the maritime context." *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013) (noting that the Ninth Circuit looks to the Restatement (Second) of Contracts to determine the basic elements of contract law). Courts, however, may use state law to interpret maritime contracts, provided that the state law does not clearly conflict with federal maritime law. *See Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 667-68 (9th Cir. 1997).

"Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Citgo Asphalt*, 140

S. Ct. at 1088 (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). "In such circumstances, the parties' intent 'can be determined from the face of the agreement' and 'the language that they used to memorialize [that] agreement.'" *Id.* (quoting 11 R. Lord, *Williston on Contracts* § 30:6, at 97-98, 112-113 (4th ed. 2012)). "But '[w]hen a written contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of [the] parties in entering the contract'; that may involve examining 'relevant extrinsic evidence of the parties' intent and the meaning of the words that they used.'" *Id.* (quoting 11 *Williston on Contracts* § 30:7, at 116-119, 124). "Disagreement as to the meaning of a maritime contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties." *In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 859 (8th Cir. 2010) (quoting *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)).

The parties' dispute centers on the meaning of the term "[m]inimum monthly payment of $75k/month" in the Agreement. (Mot. at 8-12; Resp. at 9-11; Agreement at 1.) Plaintiffs assert that this language, read in conjunction with the entire Agreement, unambiguously provides that the charter hire rate would remain fixed at $75,000 throughout the term of the charter, and that any change to that rate could only be effected through a writing signed by both parties. (Mot. at 8-12 (citing Agreement at 1, § 9(f)).)

The court agrees with Plaintiffs that the term "minimum payment of $75k/month" is unambiguous when read in context with the entire Agreement and that, absent a written modification signed by both parties, the charter hire rate remains $75,000 per month. First, although the word "minimum" refers to the smallest charter hire rate acceptable

during the term of the charter, the Agreement does not include any language that allows for a unilateral increase from that minimum by Lovel Briere. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "minimum" as "[o]f, relating to, or constituting the smallest acceptable or possible quantity in a given case"); Random House Unabridged Dictionary (2022) (defining "minimum" as "the least quantity or amount possible, assignable, allowable, or the like"); (*see generally* Agreement). To the contrary, the only language regarding modification of the Agreement expressly provides that the Agreement "may not be modified except through a writing signed by both parties" and that it "constitutes the entire agreement between the between the parties and replaces all prior and contemporaneous agreements, written and oral." (Agreement § 9(f).) In addition, the Agreement expressly provides for additional payments and obligations owed by Plaintiffs. (*See, e.g.*, Agreement at 1 (stating the charter is a "triple net lease which includes bank fees and other misc[.] charges"); *id.* § 2 (making the charterer responsible for "all charges and expenses of every kind and nature whatsoever relating to the Vessel and/or its use or operation during the charter term" and allowing Lovel Briere to charge interest for "sums due but not paid"); *id.* § 4 (assigning to the charterer all "costs, charges and expenses of every kind and nature whatsoever relating to the Vessel and/or its use or operation during the charter term").) The Amendment, which was signed by both parties in accordance with section 9(f) of the Agreement, modified only the duration of the charter—it made no provision for an increase in the charter hire rate. (Amendment.) In light of the foregoing, the court concludes that Plaintiffs have met their burden to show that they are likely to succeed on their claim that the charter hire rate for the Vessel

remains $75,000 per month for the term of the charter, absent an agreement in writing signed by both parties.

Lovel Briere's arguments to the contrary are not persuasive. First, it argues that the language providing for a "minimum" charter hire rate contemplates that "there are scenarios in which more than $75,000 would be due in a given month." (Resp. at 10.) This may be so, but section 9(f) provides a mechanism to increase the monthly payment due by modifying the Agreement via a writing signed by both parties. (Agreement § 9(f).) In contrast, the Agreement includes no language that provides Lovel Briere the right to unilaterally demand an increase in the charter hire rate. The only unilateral actions authorized in the Agreement are Lovel Briere's right to terminate the Agreement and retake the Vessel if Plaintiffs "fail[] to perform under [the] agreement, file[] for or [are] placed in bankruptcy, or [have] a receiver appointed to it" and the right of either party to terminate the Agreement at the end of the charter term. (Agreement § 9(b); *id.* at 1.) Nor is Lovel Briere's argument that "it is patently unreasonable to have a charter of a vessel extending into perpetuity without the ability to adjust the hire rate over time" sympathetic. (Resp. at 10.) The Agreement and the Amendment set limits on the charter term—first 87 months, then 120 months—and, again, nothing in the Agreement prohibits the parties from renegotiating the charter hire rate either at the end of the charter term or, indeed, during the charter term itself. (*See* Agreement; Amendment.) Lovel Briere's remaining arguments rely either on Mr. Franco's testimony about his and the deceased Mr. Prophet's mindsets when they entered into the Agreement—extrinsic evidence that the court need not consider where it determines that the language of the Agreement is

unambiguous—and his protests that the $75,000 charter hire rate is now "unconscionably low." (Resp. at 10.) Neither, however, changes the court's interpretation of the Agreement. Because the court concludes, at this preliminary stage of the proceedings, that Plaintiffs are likely to succeed on the merits of their claim, the court turns to its review of Lovel Briere's affirmative defenses.

### 2. Lovel Briere's Frustration-of-Purpose Affirmative Defense

Lovel Briere argues that it should be allowed to terminate the Agreement because Mr. Franco's removal as Centerline's CEO in March 2019 frustrated the purpose of the Agreement. (Resp. at 12.) The parties agree that the court should look to Washington law when evaluating Lovel Briere's frustration-of-purpose affirmative defense. (Resp. at 12; Reply at 8 n.8 (acknowledging that there does not appear to be a generally applicable maritime rule on the frustration-of-purpose doctrine).) Washington has adopted the doctrine of "discharge by supervening frustration" stated in Restatement (Second) of Contracts § 265:[4]

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

*Felt v. McCarthy*, 922 P.2d 90, 92 (Wash. 1996) (quoting Restatement (Second) of Contracts § 265). The comments to the Restatement explain that

---

[4] Lovel Briere relies on Restatement of Contracts § 288 (Am. Law Inst. 1932) in its response. As Plaintiffs point out, however, Washington adopted Restatement (Second) of Contracts § 265 (Am. Law Inst. 1979) in *Washington State Hop Producers, Inc., Liquidation Tr. v. Goschie Farms, Inc.*, 773 P.2d 70, 73 (1989).

ORDER - 14

> [t]he purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, *as both parties understand*, without it the transaction would make little sense.

*Id.* at 92-93 (quoting Restatement (Second) of Contracts § 265 cmt. a) (emphasis added). In other words, if both parties to the contract did not share the same assumption as to the principal purpose of the contract, commercial frustration does not apply. *Id.* at 93; *see also id.* at 93-94 (holding the doctrine of frustration did not apply where buyer of property did not show that the sellers entered into the sale contract on the basis of the buyer's assumption that the property would be successfully developed as a business park). A decline in the value of the contract for the affected party is not sufficient, on its own, to support a finding of frustration. *Id.* at 94.

Lovel Briere contends that a "basic assumption" of the Agreement was that "Mr. Franco would remain as CEO and controlling owner of HMS" and that his removal "substantially frustrated Lovel Briere's principal purpose in making the contract: accepting a lesser return on investment in order to maintain a favorable under-market charter rate for HMS because of Mr. Franco's ownership of the company." (Resp. at 12.) Although Mr. Franco's continued tenure as CEO and owner of HMS may have been Lovel Briere's basic assumption when it entered into the Agreement (and later the Amendment), Lovel Briere cites no evidence that Olympic shared that assumption as to the principal purpose of the contract.[5] (*See generally* Resp.; Franco Decl.) Accordingly,

---

[5] Indeed, Mr. Franco acknowledges that "helping HMS remained [his] primary purpose in the charter of the [Vessel] while [he] remained an owner of HMS." (Franco Decl. ¶ 12.)

at this preliminary stage of the litigation, the court concludes that Lovel Briere has not met its burden to show that it is likely to succeed on its frustration-of-purpose affirmative defense.

### 3. Lovel Briere's Fraudulent Inducement and Illegality Affirmative Defenses

Lovel Briere also argues that (1) Olympic fraudulently induced it to enter into the Amendment and (2) the Amendment is illegal and therefore void. (Resp. at 13-14.) Lovel Briere, however, does not explain how the Amendment or any of its terms violate any law; rather, it appears to bootstrap its illegality argument on its assertion that it was fraudulently induced to enter into the Amendment. (*See id.*); *see Thepvongsa v. Reg'l Tr. Servs. Corp.*, 972 F. Supp. 2d 1221, 1227 (W.D. Wash. 2013) ("Neither an incorrect statement of fact in a contract nor even an outright misrepresentation automatically invalidates the parties' undertaking or otherwise makes a contract illegal and unenforceable under Washington law."). Therefore, the court proceeds to evaluate Lovel Briere's fraudulent inducement affirmative defense.

The parties again agree that the court should apply Washington law. (Resp. at 13; Reply at 10 n.11.) To establish its fraudulent inducement defense, Lovel Briere must prove all of the following by "clear, cogent, and convincing evidence":

> (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage.

*Elcon Const., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012).

Lovel Briere argues that the Agreement "should be terminated because Plaintiffs convinced [it] to enter into the Amendment under false pretenses." (Resp. at 13-14.) It asserts that Olympic, through Mr. Godden, originally induced it to extend the duration of the Agreement by telling Mr. Franco that it needed the extension to secure bond financing; that Mr. Franco relied on that representation in entering into the Amendment; and that Plaintiffs now represent that HMS needed the extension in order to bid on a government contract to transport clean diesel fuel on the East Coast. (*Id.*; Franco Decl. ¶¶ 13 14.) Plaintiffs counter that Lovel Briere cannot meet its burden, at this stage of the litigation, to prove by clear and convincing evidence that Mr. Godden falsely and knowingly misrepresented the purpose of the Amendment. (Reply at 10-11.) The court agrees with Plaintiffs.

Although Mr. Franco states that Mr. Godden told him the Amendment was needed only for the bond issuance (Franco Decl. ¶ 13), Mr. Godden states that the parties agreed that the Amendment was required to enable HMS to bid on the government contract (Godden Decl. ¶ 11). Thus, there is a dispute of fact regarding the representations Mr. Godden made when the parties entered into the Amendment. In addition, although Mr. Franco asserts that the Vessel was inappropriate for the government contract, he also recognizes that HMS did in fact bid on the contract and that the contract was initially awarded to HMS before later being awarded to another marine transportation company. (Franco Decl. ¶ 14.) He further acknowledges that HMS successfully completed its bond issuance. (*Id.* ¶ 15.) The court cannot conclude, based on the record before it, that Lovel Briere has met its burden to establish by "clear, cogent, and convincing evidence" that

Plaintiffs, through Mr. Godden, knowingly made a false misrepresentation of an existing fact.  Therefore, the court concludes at this early stage of the litigation that Lovel Briere has not established that it is likely to succeed on its fraudulent inducement or illegality affirmative defenses.

In sum, the court concludes that Plaintiffs have established a likelihood of success on their declaratory judgment claim and Lovel Briere has failed to establish a likelihood of success on its affirmative defenses.  Because the parties do not dispute the remaining requirements for issuing a preliminary injunction, the court GRANTS Plaintiffs' motion for a preliminary injunction and proceeds to consider the scope of the injunction.

## C. Scope of the Injunction

Federal Rule of Civil Procedure 65(d)(1) requires that every order granting an injunction must "(A) state the reasons why it was issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  In addition, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The court has discretion to determine the amount of security required, if any.  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

Plaintiffs ask the court to restrain Lovel Briere from declaring them in default of the Agreement and arresting the Vessel pending the completion of this litigation and to refrain from imposing additional security beyond the $75,000 that the court already

ordered in conjunction with the temporary restraining order.  (Mot. at 15-17; Reply at 11-12; *see* 10/31/22 Order.)  Lovel Briere counters that it should not be enjoined from asserting a default under the Agreement.  (Resp. at 14.)  It also asks the court to impose security of $75,000 per month during the pendency of this action and any appeals to protect it from the loss of income it would otherwise receive if it chartered the Vessel to another company.  (*Id.* at 14-15.)

The court declines Lovel Briere's request to increase the security amount beyond the $75,000 it already ordered because Lovel Briere's potential harm appears to be only economic in nature and can be remedied by the award of damages and interest if it ultimately prevails in this action.  Because the court concludes that it appropriate to maintain the status quo until it reaches a decision on the merits in this action, the court further declines to allow Lovel Briere leave to declare Plaintiffs in default based on their failure to pay its proposed increased charter hire rate of $150,000 per month.  Accordingly, the court ORDERS that Lovel Briere shall be preliminarily enjoined, during the pendency of this action and any appeals, from (1) declaring Plaintiffs in default of the Agreement, as amended, related in any way to the increase in charter hire rate proposed by Lovel Briere in its September 27, 2022 letter and (2) moving to arrest the Vessel based on any such breach.

### IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' motion for a preliminary injunction (Dkt. # 3).  Lovel Briere is PRELIMINARILY ENJOINED, during the pendency of this action and any appeals, from (1) declaring Plaintiffs in default of the

Agreement, as amended (Compl., Ex. A), related in any way to the increase in hire rate proposed by Lovel Briere in its September 27, 2022 letter (Compl., Ex. B) and (2) moving to arrest the Vessel based on any such breach. No further security shall be ordered.

Dated this 16th day of February, 2023.

JAMES L. ROBART
United States District Judge

ORDER - 20