UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OLYMPIC TUG & BARGE, INC., et al., | CASE NO. C22-1530JLR |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COUNTERCLAIMS |
| v. | |
| LOVEL BRIERE LLC, | |
| Defendant. | |

## I.   INTRODUCTION

Before the court is Plaintiffs Olympic Tug & Barge, Inc. ("Olympic") and Harley Marine Financing, LLC's ("HMF") (collectively, "Plaintiffs") motion to dismiss Defendant Lovel Briere LLC's ("Lovel Briere") amended counterclaims.  (Mot. (Dkt. # 36); Reply (Dkt. # 39).)  Lovel Briere opposes Plaintiffs' motion.  (Resp. (Dkt. # 38).) The court has considered the motion, all materials submitted in support of and in

1   opposition to the motion, and the governing law.  Being fully advised,[1] the court

2   GRANTS in part and DENIES in part Plaintiffs' motion to dismiss.

3                              **II.    BACKGROUND**

4         This case arises from Lovel Briere's attempt to increase the monthly charter hire

5   rate for the barge LOVEL BRIERE (the "Vessel") under a bareboat charter agreement

6   (the "Agreement").  (*See* Compl. (Dkt. # 1); *id*., Ex. A ("Agreement"); Am. Ans. (Dkt.

7   # 35) at 5-12 ("Counterclaims").)  Below, the court sets forth the factual and procedural

8   background relevant to Plaintiffs' motion to dismiss.

9   **A.    Factual Background**

10        In 2013, non-party Harley Franco was the founder, chief executive officer

11  ("CEO"), chairman of the board of directors, and majority owner of Harley Marine

12  Services ("HMS").  (Counterclaims ¶ 1.)  HMS, which has since been renamed

13  Centerline Logistics Corporation[2] ("Centerline"), is the direct or indirect parent of

14  Plaintiffs Olympic and HMF.  (Godden Decl. (Dkt. # 4) ¶¶ 1-3; Franco Decl. (Dkt. # 25)

15  ¶ 3.)  In May 2013, Mr. Franco formed Lovel Briere, and Lovel Briere purchased the

16  Vessel from its constructor.  (Counterclaims ¶ 4.)  Lovel Briere then chartered the Vessel

17  to HMS through Olympic.  (*Id.*)

18

19

20        [1] Plaintiffs request oral argument; Lovel Briere does not.  (*See* Mot. at 1; Resp. at 1.)
    The court concludes that oral argument would not be helpful to its disposition of the motion.  *See*
21  Local Rules W.D. Wash. LCR 7(b)(4).

22        [2] Because it appears that Centerline was still known as HMS during the key events at
    issue in this matter, the court refers to HMS (rather than Centerline) throughout this order.

Olympic and Lovel Briere entered into the Agreement on May 22, 2013.  (Compl. ¶ 8; *see* Agreement.)  To avoid conflicts of interest, HMS's then-chief financial officer, Todd Prophet, represented HMS's interests in entering into the Agreement and Mr. Franco recused himself from any vote of HMS's board of directors involving the terms of the Agreement.  (Counterclaims ¶ 5.)  The Agreement was prepared by HMS's attorney at Mr. Prophet's direction, and Mr. Prophet determined the charter hire rate.  (*Id.* ¶¶ 6, 8.) Lovel Briere asserts that the parties used the short form Agreement because the charter was a "related party transaction that was based upon the mutual assumption that Mr. Franco would remain as CEO and majority owner of HMS."  (*Id.* ¶ 6.)

Mr. Franco signed the Agreement on behalf of Lovel Briere, and Mr. Prophet signed on behalf of Olympic.  (Agreement at 2.)  The Agreement provides that Lovel Briere would charter the Vessel to Olympic for a term of 87 months, for a "[m]inimum monthly payment of $75k/month."  (*Id.* at 1.)  It specifies that the lease "is a triple net lease which includes bank fees and other misc[ellaneous] charges" and states that the lease would "automatically renew and extend in perpetuity until and unless terminated by either party in writing."  (*Id.*)  The Agreement further provides that it (1) "may not be modified except through a writing signed by both parties" and (2) "constitutes the entire agreement between the parties and replaces all prior and contemporaneous agreements, written and oral."  (*Id.* § 9(f).)

The Agreement does not contain any terms that expressly govern the process for changing the charter hire rate.  (*See generally id.*)  Lovel Briere, however, alleges that "the term 'minimum' was included in the charter hire rate term to provide for upward

1    adjustments to the charter hire rate if Lovel Briere's financing expenses, bank fees, and

2    other charges increased or other circumstances warranted." (Counterclaims ¶ 11.)  It also

3    alleges that Mr. Franco and Mr. Prophet agreed, and "took steps to ensure," that the

4    charter hire rate "would be and remain within the range of commercially reasonable

5    charter hire rates for barges of the same capacities and condition as the [Vessel]." (*Id.*

6    ¶ 9; *see also id.* ¶ 12 (alleging that a "basic assumption" of the Agreement was that Mr.

7    Franco would remain CEO of HMS and that he and Mr. Prophet "would negotiate in

8    good faith to modify the charter hire rate" if there were changes in Lovel Briere's

9    financing expenses or if the charter hire rate was no longer commercially reasonable).)

10   Mr. Prophet passed away in June 2017. (*Id.* ¶ 13.)  In January 2018, HMS's then

11   chief operating officer, Matt Godden, asked Mr. Franco to amend the Agreement to

12   extend the charter for 10 years. (*Id.* ¶ 14.)  Lovel Briere asserts that Mr. Godden

13   represented to Mr. Franco that HMS needed the amendment so that it could issue bonds

14   to refinance its existing debt and fund its operations, and that Mr. Franco relied on this

15   representation when he agreed to amend the charter. (*Id.* ¶¶ 14-15.)  Lovel Briere alleges,

16   however, that Mr. Godden's actual purpose for seeking the extended charter was to

17   "misrepresent to the U.S. government the availability of the [Vessel] to fulfill the

18   requirements of a government solicitation." (*Id.* ¶ 16.)  According to Lovel Briere, the

19   Vessel was not available for the solicitation because it was under contract with one of

20   HMS's major customers, was "on the wrong coast," and "was not suited to fulfill the

21   needs of the government solicitation." (*Id.*)

22

1    Mr. Franco and Mr. Godden executed the amendment to the charter on January 3,

2    2018.  (Agreement at 3 ("Amendment").)  The Amendment extended the term of the

3    Agreement for 120 months, until December 31, 2027, but did not increase the $75,000

4    per month charter hire rate.  (*Id.*)  Olympic assigned the Agreement, as amended, to HMF

5    in May 2018.  (Godden Decl. ¶ 8.)

6    In July 2018, shortly after HMS completed its successful issuance of bonds to

7    refinance its operations, HMS's board of directors voted to terminate Mr. Franco as CEO.

8    (Counterclaims ¶ 18.)  The termination was effective in spring 2019.  (*Id.*)  As a result,

9    Mr. Franco is also no longer an owner of HMS.  (*Id.* ¶ 19.)  Meanwhile, Mr. Godden was

10    appointed CEO of HMS (now known as Centerline) and received 13% of its equity

11    ownership.  (*Id.* ¶ 18.)

12    In 2022, the financing for Lovel Briere's purchase of the Vessel expired and Lovel

13    Briere "was forced" to refinance the mortgage debt on the Vessel.  (*Id*. ¶ 20.)  According

14    to Lovel Briere, its finance expenses, bank fees, and other charges have "materially

15    increased" since the parties entered into the Agreement.  (*Id.*)  As a result, Lovel Briere's

16    current monthly loan payment "substantially exceeds" the $75,000 charter hire rate

17    currently paid by Plaintiffs.  (*Id.*)  Lovel Briere represents that this increase effectively

18    prevents it from refinancing its existing mortgage debt and puts it at risk of further

19    increases in its financing costs and possible foreclosure.  (*Id.*)

20    On September 27, 2022, Lovel Briere's attorney wrote a letter to Mr. Godden,

21    now CEO of Centerline, to give notice that Lovel Briere was increasing the charter hire

22    rate of the Vessel from $75,000 per month to $150,000 per month, effective November 1,

2022.  (Compl., Ex. B ("9/27/22 Letter") at 1.)  Lovel Briere offered that HMF could, as an alternative to paying the higher charter hire rate, either terminate the Agreement and return the Vessel on or before October 31, 2022, or purchase the Vessel on an all-cash basis before November 1, 2022.  (*Id.* at 2.)  Lovel Briere closed by stating that it would declare a breach of the Agreement as of November 1, 2022, if HMF continued to possess the Vessel without paying the increased charter hire rate.  (*Id.*)  Lovel Briere alleges that Plaintiffs have since refused to negotiate in good faith to agree on a "reasonable adjustment" of the charter hire rate.  (Counterclaims ¶ 23.)

**B.    Procedural Background**

Plaintiffs filed their complaint in this matter on October 27, 2022.  (*See generally* Compl.)  They seek a declaratory judgment that the Agreement, as amended, is a valid and binding contract that remains in "full force and effect;" that the monthly charter hire rate under the Agreement is $75,000 per month, triple net; and that the term of the Agreement expires on December 31, 2027, per the terms set forth in the Amendment. (*Id.* at 6.)  Plaintiffs also filed an emergency motion for a temporary restraining order and a preliminary injunction.  (*See* PI Mot. (Dkt. # 3).)

On October 31, 2022, the court granted Plaintiffs' motion for a temporary restraining order; enjoined Lovel Briere from declaring a breach of the Agreement related to the increase of the hire rate for the Vessel and arresting the Vessel based on any such breach; and ordered Plaintiffs to provide security of $75,000 pursuant to Federal Rule of Civil Procedure 65(c).  (TRO Order (Dkt. # 10).)  Lovel Briere answered Plaintiffs' complaint and asserted counterclaims on November 21, 2022.  (Ans. (Dkt. # 23).)  After

1   Plaintiffs moved to dismiss Lovel Briere's original counterclaims, the parties stipulated to

2   allow Lovel Briere to amend its counterclaims and Plaintiffs withdrew their original

3   motion to dismiss.  (*See* 1st MTD (Dkt. # 28); 1/17/23 Stip. and Order (Dkt. # 33).)

4       Lovel Briere filed its amended answer and counterclaims on January 18, 2023.

5   (Am. Ans.)  It alleges counterclaims against Plaintiffs for a declaratory judgment

6   (Counterclaims ¶¶ 26-29); reformation of the Agreement and its Amendment to increase

7   the charter hire rate (*id.* ¶¶ 30-31); fraud and material misrepresentation (*id.* ¶¶ 32-33);

8   breach of contract (*id.* ¶¶ 34-35); conversion of the Vessel (*id.* ¶¶ 36-38); and breach of

9   the covenant of good faith and fair dealing (*id.* ¶¶ 39-40).  Plaintiffs filed the instant

10  motion to dismiss Lovel Briere's amended counterclaims on February 8, 2023.  (Mot.)

11      On February 16, 2023, the court granted Plaintiffs' motion for a preliminary

12  injunction and preliminarily enjoined Lovel Briere from (1) declaring Plaintiffs in default

13  of the Agreement, as amended, related in any way to the increase in hire rate proposed by

14  Lovel Briere in its September 27, 2022 letter and (2) moving to arrest the Vessel based on

15  any such breach.  (*See generally* 2/16/23 Order (Dkt. # 20).)  In relevant part, the court

16  preliminarily held that the phrase "[m]inimum monthly payment of $75k/month" in the

17  Agreement was "unambiguous when read in context with the entire Agreement and that,

18  absent a written modification signed by both parties, the charter hire rate remains $75,000

19  per month."  (*Id.* at 11.)  The court also held that Lovel Briere had not met its burden at

20  that preliminary stage of the proceedings to establish a likelihood of success on its

21  frustration-of-purpose, fraudulent inducement, and illegality affirmative defenses.  (*Id.* at

22  14-18.)

1    Lovel Briere filed its response to Plaintiffs' motion to dismiss on February 27,

2  2023, and Plaintiffs replied on March 3, 2023.  (Resp.; Reply.)  Plaintiffs' motion to

3  dismiss is now ripe for decision.

### III.    ANALYSIS

5    Plaintiffs move the court to dismiss Lovel Briere's counterclaims with prejudice.

6  (*See generally* Mot.)  Below, the court sets forth the standard for evaluating motions to

7  dismiss a counterclaim for failure to state a claim, then considers Plaintiffs' motion to

8  dismiss.

### A.    Motion to Dismiss Standard

10    Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint

11  "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The

12  same pleading standard, and standard of review, applies to counterclaims.  *See Starr v.*

13  *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a . . . counterclaim . . . must

14  contain sufficient allegations of underlying facts to give fair notice and to enable the

15  opposing party to defend itself effectively."); *see also Lemman v. Foley*, No.

16  C20-0591JCC, 2020 WL 7181055, at *1 (W.D. Wash. Dec. 7, 2020) (noting that a

17  motion to dismiss a counterclaim is evaluated under the same standards applicable to a

18  motion to dismiss a complaint).

19    Under this standard, the court construes the counterclaim in the light most

20  favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

21  416 F.3d 940, 946 (9th Cir. 2005), and asks whether the counterclaim contains "sufficient

22  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court need not accept as true legal conclusions, "formulaic recitation[s] of the legal elements of a cause of action," *Chavez v. United States*, 683 F.3d 1102, 1008 (9th Cir. 2012), or "conclusory allegations that are contradicted by documents referred to in the complaint," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**B.    Breach of Contract**

Lovel Briere alleges that it is entitled to damages it suffered "as a result of Plaintiffs' continued possession of the [Vessel] while paying charter hire at the rate [of] $75,000 rather than at the current market rate for charter of the [Vessel] of $150,000." (Counterclaims ¶ 35.)  Relatedly, Lovel Briere also seeks a declaration that the Agreement, as amended, "used the term 'minimum' to provide flexibility to adjust the price periodically as necessary to account for [Lovel Briere's] increased financing expenses, bank fees, and other charges, and to maintain the charter hire rate within the range of commercially reasonable charter hire rates for barges of similar capacities and condition."  (*Id.* ¶ 27.)

Courts "interpret and resolve disputes concerning maritime contracts according to federal law." *Heko Servs., Inc. v. ChemTrack Alaska, Inc.*, 418 F. Supp. 3d 656, 660 (W.D. Wash. 2019) (first citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004); and then citing *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007)).  "Maritime

1    contracts must be construed like any other contracts:  by their terms and consistent with

2    the intent of the parties." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, --- U.S. ---,

3    140 S. Ct. 1081, 1087-88 (2020).  "Basic principles in the common law of contracts

4    readily apply in the maritime context." *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189,

5    1194 (9th Cir. 2013) (noting that the Ninth Circuit looks to the Restatement (Second) of

6    Contracts to determine the basic elements of contract law).  Courts, however, may use

7    state law to interpret maritime contracts, provided that the state law does not clearly

8    conflict with federal maritime law.  *See Aqua-Marine Constructors, Inc. v. Banks*, 110

9    F.3d 663, 667-68 (9th Cir. 1997); (*see also* Agreement § 9(d) (providing that the

10   Agreement "shall be governed by the general maritime law of the United States or, in the

11   absence of an applicable general maritime rule of law, by the laws of the State of

12   Washington")).

13        Plaintiffs argue that the court's order on their motion for preliminary injunction

14   forecloses Lovel Briere's breach of contract claim.  (Reply at 4.)  They point to the

15   court's preliminary holding that the phrase "[m]inimum monthly payment of

16   $75k/month" in the Agreement was "unambiguous when read in context with the entire

17   Agreement and that, absent a written modification signed by both parties, the charter hire

18   rate remains $75,000 per month."  (*Id.* (quoting 2/16/23 Order at 11).)  Thus, according to

19   Plaintiffs, there is no breach of the Agreement because there is no dispute that they have

20   consistently paid the $75,000 hire rate throughout the duration of the charter and the

21   parties have not agreed in writing to increase the hire rate.  (Mot. at 11-12.)  Lovel Briere

22   counters that the term "minimum" is ambiguous because does not specify which "bank

1    fees and other misc[ellaneous] charges" are included in the triple-net lease.  (Resp. at 3-6

2    (citing Agreement at 1).)  It also argues that the only way to make sense of the term

3    "minimum," in light of the perpetual term of the Agreement and the triple-net provision,

4    is to interpret it as meaning that the charter hire rate would be increased over time to

5    account for increases in Lovel Briere's financing expenses, bank fees, and other charges.

6    (*Id.* at 5.)

7          The court is not persuaded to amend its determination that the language of the

8    Agreement is unambiguous.  As the court held in its order granting Plaintiffs' motion for

9    a preliminary injunction, there is no language in the Agreement that grants Lovel Briere

10   the right to announce a unilateral increase in the charter hire rate.  (*See* 2/16/23 Order at

11   11-14.)  To the contrary, the Agreement provides that any changes to the Agreement must

12   be made in a writing signed by the parties and expressly states that it "constitutes the

13   entire agreement between the parties and replaces all prior and contemporaneous

14   agreements, written and oral."  (*See id.* (citing Agreement § 9(f)).)  In addition, the

15   Agreement contains provisions regarding Plaintiffs' responsibility for additional costs.

16   (*See id*. at 12 (citing Agreement §§ 2, 4).)  Because Lovel Briere makes no allegation that

17   Plaintiffs have failed to pay the minimum $75,000 per month charter hire rate or

18   otherwise breached the express terms of the Agreement, the court GRANTS Plaintiffs'

19   motion to dismiss Lovel Briere's breach of contract counterclaim.  For the same reasons,

20   the court also GRANTS Plaintiffs' motion to dismiss Lovel Briere's counterclaim for a

21   declaratory judgment claim regarding the meaning of the word "minimum" in the

22   Agreement.  These counterclaims are DISMISSED without leave to amend to the extent

1  they are based on Lovel Briere's assertion that the term "minimum" grants it a unilateral

2  right to increase the Vessel's charter hire rate.  *Carvalho v. Equifax Info. Servs., LLC*,

3  629 F.3d 876, 893 (9th Cir. 2010) (noting that a district court should grant leave to amend

4  unless "it is clear . . . that the complaint would not be saved by any amendment").

5  **C.      Reformation**

6          Lovel Briere alleges that it is entitled to reformation of the Agreement and its

7  Amendment to "increase the charter hire rate to a reasonable market rate for the charter

8  for the [Vessel]."  (Counterclaims ¶ 31.)  As an alternative to reformation, it seeks a

9  declaration that the Agreement is voidable.  (*Id.* ¶ 28.)  Lovel Briere asserts mutual

10  mistake as the basis for these claims.  (*See* Resp. at 7, 9.)

11         "A mistake is a belief not in accord with the facts."  *Simonson v. Fendell*, 675 P.2d

12  1218, 1221 (Wash. 1984) (citing Restatement (Second) of Contracts § 151 (Am. Law

13  Inst. 1981)).  The Washington Supreme Court has set forth the elements of a mistake as

14  follows:

15              The belief must be held at the time the contract is made.  The mistake must
                relate to a basic assumption on which both parties relied when making the
16              contract.  It must have a material effect on the agreement.  Finally, a party
                may invoke the mistake doctrine only if the party did not bear the risk of
17              mistake.

18  *Denaxas v. Sandstone Ct. of Bellevue, L.L.C.*, 63 P.3d 125, 131 (Wash. 2003) (internal

19  citations omitted).  "A party bears the risk of a mistake when 'he is aware, at the time the

20  contract is made, that he has only limited knowledge with respect to the facts to which

21  the mistake relates but treats his limited knowledge as sufficient.'"  *Bennett v. Shinoda*

22  *Floral, Inc.*, 739 P.2d 648, 653 (Wash. 1987) (quoting Restatement (Second) of Contracts

1    § 154(b)).  "In such a situation, there is no mistake.  Instead, there is an awareness of

2    uncertainty or conscious ignorance of the future."  *Id.*

3            "[M]utual mistake can be grounds for reformation, an equitable remedy that brings

4    a writing that is materially different from the parties' agreement into conformity with that

5    agreement."  *Ocean Gold Seafoods Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*,

6    No. C18-5425JLR, 2020 WL 6561611, at *4 (W.D. Wash. Nov. 9, 2020) (citing

7    *GLEPCO, LLC v. Reinstra*, 307 P.3d 744, 752 (Wash. Ct. App. 2013)).  A contract is

8    voidable on grounds of mutual mistake when both parties independently make a mistake

9    at the time the contract is made as to a basic assumption of the contract—except where

10   the party seeking avoidance bears the risk of the mistake.  *Bennett*, 739 P.2d at 396.

11           Lovel Briere argues that the parties' mutual mistake was "that their mutual intent,

12   that the Charter Hire rate would be increased over time to account for increases in [Lovel

13   Briere's] borrowing costs, was adequately expressed in the [Agreement] drafted by Mr.

14   Prophet."  (Resp. at 8, 10.)  As the basis for this position, it points to its allegations that

15   (1) "the term 'minimum' was included in the [Agreement's] charter hire rate term to

16   provide for upward adjustments to the charter hire rate if Lovel Briere's financing

17   expenses, bank fees, and other charges increased"; (2) Mr. Prophet "agreed with [Mr.]

18   Franco, and took steps to ensure, that the charter hire rate would be and remain within the

19   range of commercially reasonable charter hire rates for a barge of similar capacities and

20   conditions"; and (3) the parties shared a mutually mistaken assumption that Mr. Franco

21   would remain CEO and majority shareholder of HMS throughout the term of the

22   Agreement and would remain "in a position to negotiate reasonable increase[s] in the hire

1   rate over the perpetual term of the charter." (*Id.* at 7-10 (citing Counterclaims ¶¶ 9, 11,

2   18-19[3]).)  Plaintiffs argue that Lovel Briere cannot rely on the doctrine of mutual mistake

3   because it bore the risk of any mistake.  They assert that the assumption that Mr. Franco

4   would remain indefinitely in his role as CEO and majority owner of HMS was an

5   "inherently uncertain" prediction about the future.  (Mot. at 15; Reply at 8.)

6           The court agrees with Plaintiffs.  The Restatement explains that the erroneous

7   belief underlying a mistake "must relate to the facts as they exist at the time of the

8   making of the contract."  Restatement (Second) of Contracts § 151 (1981) cmt. a.

9   Furthermore, "[a] party's prediction or judgment as to events to occur in the future, even

10  if erroneous, is a not a 'mistake' as that word is defined [in § 151]."  *Id.*  An illustration

11  provided with the Restatement's definition of "mistake" is instructive:

> A contracts to sell and B to buy stock amounting to a controlling interest in
> C Corporation.  At the time of making the contract, both A and B believe that
> C Corporation will have earnings of $1,000,000 during the following fiscal
> year.  Because of a subsequent economic recession, C Corporation earns less
> than $500,000 during that year.  Although B may have shown poor judgment
> in making the contract, there was no mistake of either A or B, and the rules
> stated in this Chapter do not apply.

16  (*Id.* cmt. a, Illus. 2.)  In this illustration, A and B's shared assumption that C Corporation

17  would achieve high earnings in the following fiscal year is analogous to Mr. Prophet and

18  Mr. Franco's (allegedly) shared assumption that Mr. Franco would remain in his position

19  as CEO and majority owner over the term of the Agreement.  The assumptions in both

---

[3] The court assumes Lovel Briere mistakenly cited paragraphs 16 and 17 of its original
answer and counterclaims in its response.  (*See* Resp. at 9; Ans. at 7, ¶¶ 16-17.)  The allegations
described in the response are found in paragraphs 18 and 19 of the amended answer and
counterclaims.  (*See* Counterclaims ¶¶ 18-19.)

1    scenarios are predictions about the future, rather than mistakes about facts that existed at

2    the time the parties entered into the contracts at issue.  As a result, there was no "mutual

3    mistake" underlying the making of the Agreement that would justify reforming or

4    voiding the Agreement.  To the extent Lovel Briere points to a mistaken shared belief that

5    the Agreement adequately represented that the charter hire rate would increase over time,

6    this belief, too, was based on the parties' alleged shared assumption that Mr. Franco

7    would remain in control of HMS and in a position to negotiate those changes.  (*See* Resp.

8    at 9; Counterclaims ¶¶ 18-19.)  Therefore, the court GRANTS Plaintiffs' motion to

9    dismiss Lovel Briere's counterclaims for reformation and for a declaratory judgment that

10   the Agreement is voidable.  These counterclaims are DISMISSED without leave to

11   amend.  *Carvalho*, 629 F.3d at 893.

12   **D.    Fraud or Misrepresentation**

13       Lovel Briere alleges that it is "entitled to cancellation, rescission, and/or

14   termination of the Amendment due to fraud or misrepresentation by HMS in procuring

15   the Amendment."  (Counterclaims ¶ 33.)  It also seeks a declaratory judgment "that the

16   Amendment is voidable and unenforceable because [Plaintiffs] induced [Lovel Briere] to

17   enter into the Amendment through fraud or misrepresentation, and that the [Agreement]

18   has expired under its original terms."  (*Id.* ¶ 29.)

19       The parties agree that a party seeking to prevail on a claim that a maritime contract

20   was fraudulently procured "must show that (1) the deceiving party made a material

21   misrepresentation or nondisclosure, (2) the representation was false or the nondisclosure

22   implied that the facts were different from what the deceived party understood them to be,

(3) the deceiving party knew that the representation was false or that the nondisclosure

implied the existence of false facts, (4) the deceiving party intended the deceived party to

rely on the misrepresentation or nondisclosure, and (5) the deceived party detrimentally

relied upon the misrepresentation or nondisclosure." *Black Gold Marine, Inc. v. Jackson*

*Marine Co.*, 759 F.2d 466, 470 (5th Cir. 1985); (*see* Mot. at 16-17; Resp. at 11).  A party

alleging fraud must "state with particularity the circumstances constituting" the fraud.

Fed. R. Civ. P. 9(b).

Here, Lovel Briere alleges that (1) Mr. Godden, on behalf of Olympic, knowingly

and falsely represented to Mr. Franco that the Amendment was necessary for HMS to

issue bonds when he in fact intended to use the Amendment to bid for a government

contract; (2) the misrepresentation was material because Mr. Franco would not have not

have agreed to the Amendment had he known that Olympic would use it to pursue the

government contract; (3) Mr. Franco relied on the representation that the Amendment

was necessary for financing; and (4) Mr. Franco's reliance was to Lovel Briere's

detriment because Plaintiffs have since refused to negotiate an increase in the charter hire

rate for the Vessel.  (*See* Resp. at 11-13; Counterclaims ¶¶ 13-19).)  Based on these

allegations, the court concludes that Lovel Briere has plausibly alleged that Plaintiffs

fraudulently induced it to enter into the Amendment.

Plaintiffs argue that it is implausible that Mr. Franco (1) would have been unaware

of Mr. Godden's intent to offer the Vessel for the government contract, (2) would have

known that the Vessel was unsuited for the government's purpose, and (3) refused to

execute the Amendment even though its terms were otherwise acceptable to him.  (Reply

at 10-11.)  In the court's view, however, Plaintiffs' implausibility argument only

highlights that Lovel Briere's allegations raise factual questions that are not appropriate

to resolve at this stage of the proceedings.  Accordingly, the court DENIES Plaintiffs'

motion to dismiss Lovel Briere's counterclaims for fraud or misrepresentation based on

its allegations that Plaintiffs fraudulently induced it to enter into the Amendment.

**E.    Conversion**

Lovel Briere alleges that Plaintiffs have "converted the [Vessel] to their exclusive

possession and use" and that it is entitled to damages as a result.  (Counterclaims ¶ 38.)

It does not direct the court to the specific allegations that support its claim for conversion.

(*See* Resp. at 14-15.)

"In the admiralty context, as elsewhere, conversion is simply an intentional and

wrongful exercise of dominion or control over a chattel, which seriously interferes with

the owner's right in the chattel." *In re Millenium Seacarriers*, No. 01-10180 (CB),

02 CV 8493 (RPP), 2003 WL 22939112, at *16-17 (S.D.N.Y. Dec. 11, 2003) (quoting

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4. F.3d 90, 94 (1st Cir.

1993)).  Under Washington law, conversion requires proof of three elements:  "(1) willful

interference with chattel belonging to the plaintiff, (2) by either taking or unlawful

retention, and (3) thereby depriving the owner of possession." *Burton v. City of Spokane*,

482 P.3d 968, 970 (Wash. Ct. App. 2021).

Plaintiffs assert that Lovel Briere's conversion claim is barred by the independent

duty doctrine.  (Mot. at 19-20.)  Under this doctrine, "[a]n injury is remediable in tort if it

traces back to the breach of a tort duty arising independently of the terms of the

1   contract. . . . When no independent tort duty exists, tort does not provide a remedy."

2   *Puget Soundkeeper All. v. APM Terminals Tacoma LLC*, 545 F. Supp. 3d 893, 897 (W.D.

3   Wash. 2021) (quoting *Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1262

4   (Wash. 2010)).  Lovel Briere explains in response that its conversion claim arises from

5   Mr. Godden's independent tort duty to avoid misrepresentations.  (Resp. at 14-15.)  It

6   argues that if Mr. Godden had not fraudulently induced Mr. Franco to enter into the

7   Amendment, the charter term would have expired in 2020, and Plaintiffs' current

8   possession of the Vessel would be unlawful.  (*Id.*)

9        The court agrees with Plaintiffs that Lovel Briere's conversion claim is barred by

10  the independent duty doctrine.  Plaintiffs' possession of the Vessel arises solely from the

11  Agreement, as amended.  (Agreement § 4 (providing that Plaintiffs "have full, complete

12  and exclusive responsibility, possession, command and control of the Vessel and its

13  navigation and operation for the full duration of the charter term").)  The Agreement also

14  provides that Lovel Briere may retake the Vessel only in the event of Plaintiffs' default.

15  (*Id.* § 9(b).)  Thus, Plaintiffs' duty to surrender the Vessel to Lovel Briere also arises

16  from the Agreement.  *See, e.g.*, *TinyBuild LLC v. Nival Int'l Ltd.*, No. C19-0805TSZ,

17  2020 U.S. Dist. LEXIS 87122, at *3 (W.D. Wash. May 18, 2020) (dismissing conversion

18  claim where "any duty that defendant might have to relinquish the source code to plaintiff

19  arises solely from the parties' contract, and in the absence of an independent tort duty,

20  plaintiff may not pursue a conversion claim").  Although it is true, as Lovel Briere

21  argues, that Plaintiffs had an independent tort duty to avoid misrepresentations in the

22  making of the Agreement, Plaintiffs' alleged breach of that duty gives rise to Lovel

Briere's counterclaims for fraud and misrepresentation. *See Donatelli v. D.R. Strong Consulting Eng's, Inc.*, 312 P.3d 620, 623 (Wash. 2013) (holding the tort duty to avoid misrepresentations that induce a party to enter into a contract arises independently of the contract). Lovel cannot base its separate tort claim for conversion on Plaintiffs' alleged breach of their duty to avoid misrepresentations. Therefore, the court GRANTS Plaintiffs' motion to dismiss Lovel Briere's conversion counterclaim. This counterclaim is DISMISSED without leave to amend. *Carvalho*, 629 F.3d at 893.

**F.      Breach of Good Faith and Fair Dealing**

Lovel Briere alleges that Plaintiffs have breached their duty of good faith and fair dealing. (Counterclaims ¶ 40.[4]) Under Washington law, "[t]here is in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (quoting *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991)). The implied covenant of good faith and fair dealing "cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." *Id.* Instead, "the duty arises only in connection with terms agreed to by the parties." *Id.* (quoting *Badgett*, 807 P.3d at 360).

Lovel Briere does not specify in its counterclaims the contract terms at issue or how Plaintiffs allegedly breached their duty of good faith and fair dealing, nor does Lovel Briere direct the court to the allegations that support its counterclaim. (*See generally*

---

[4] The court assumes that Lovel Briere's allegation that "*Defendant* has breached its duty of good faith and fair dealing" is a scrivener's error. (*See id.* (emphasis added).)

Counterclaims; *see* Resp. at 15-16.)  Instead, Lovel Briere attempts to explain the basis of

its counterclaim in its brief.  (*See* Resp. at 15-16.)  A plaintiff, however, may not amend

its pleading via its responsive brief.  *See Riser v. Cent. Portfolio Control Inc.*, No.

C21-5238LK, 2022 WL 2209648, at *4 n.1 (W.D. Wash. June 21, 2022); *see also*

*Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) ("It is axiomatic that the

complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Lovel Briere's failure to allege sufficient factual matter in its counterclaim that, accepted

as true, would state a claim for breach of the duty of good faith and fair dealing is fatal to

its claim.  *Iqbal*, 556 U.S. at 678.  Therefore, the court GRANTS Plaintiffs' motion to

dismiss Lovel Briere's counterclaim for breach of the duty of good faith and fair dealing

and DISMISSES the counterclaim with leave to amend.  *Carvalho*, 629 F.3d at 893.

## IV.  CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part

Plaintiffs' motion to dismiss Lovel Briere's counterclaims (Dkt. # 36).  Specifically:

1.    The court DISMISSES with prejudice and without leave to amend Lovel

Briere's counterclaims for breach of contract, reformation, conversion, and declaratory

judgments regarding the meaning of the term "minimum" in the Agreement and

voidability based on mutual mistake;

2     The court DISMISSES without prejudice and with leave to amend Lovel

Briere's counterclaim for breach of the duty of good faith and fair dealing; and

3.    The court DENIES Plaintiffs' motion to dismiss Lovel Briere's

counterclaim for fraud or misrepresentation.

1    Lovel Briere shall file its amended counterclaims, if any, by no later than **April**

2    **21, 2023**.  If Lovel Briere does not timely file its amended counterclaims, the court will

3    DISMISS those counterclaims with prejudice.

4         Dated this 10th day of April, 2023.

5

6

7    JAMES L. ROBART
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22